FILED
U.S. DISTRICT COURT, E.D.N.Y.
IN CLERK'S OFFICE
LONG ISLAND COURTHOUSE

★      1 1 2008      ★

ENTERED

★ ─────── ★

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
KITTY WALK SYSTEMS, INC., JEFF
KING and LISE KING,

                Plaintiffs,

-against-

MIDNIGHT PASS INCORPORATED,
BRADFORD D. WHITE, JULIE ANNE
WHITE, BARRETT DISTRIBUTION
CENTERS, INC.,
formerly known as BARRETT WAREHOUSE
AND TRANSPORT, INC. and SAN JOSE
DISTRIBUTION SERVICES, INC.,

                Defendants.
----------------------------------------------------------X

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

CV 05-6110

(Wexler, J.)

APPEARANCES:

        SHER & SHER, P.C.
        BY: DANIEL J. SHER, ESQ.
        111 Great Neck Road
        P.O. Box 376
        Great Neck, NY 11021
        Attorneys for Plaintiffs

        EISENBERG & CARTON
        BY: LLOYD M. EISENBERG, ESQ.
            RUYA CARTON, ESQ.
        2631 Merrick Road, Suite 401
        Bellmore, New York 11710
        Attorneys for Defendants

WEXLER, J.

        This is an action commenced by parties to a joint venture business agreement against

their co-venturers. Plaintiffs are Kittywalk Systems, Inc. ("Kittywalk") and its principals, Jeff King and Lise King (the "Kings")( collectively "Plaintiffs"). Defendants are Midnight Pass Incorporated ("Midnight Pass"), as well as Bradford D. White and Julie Anne White (the "Whites") (collectively "Defendants").

Shortly after commencement of this action, Defendants were granted leave to move to dismiss. This court granted Defendants' motion to dismiss all of Plaintiffs' claims but the claim for an accounting. See Kitty Walk Sys., Inc. v. Midnight Pass Inc., 431 F. Supp.2d 306 (E.D.N.Y. 2006). The court's subsequent ruling on a motion to dismiss Defendants' counterclaim left for trial two causes of action: (1) an equitable action for an accounting and (2) Defendants' Lanham Act counterclaim. The court tried these claims together, submitting the Lanham Act claim to a jury and reserving for itself the non-jury action for an accounting. The jury reached a decision and awarded nothing to Defendants on the Lanham Act claim. As to the non-jury claim, the parties have submitted proposed findings of fact, conclusions of law and legal memoranda. The court has considered those submissions and this constitutes the Court's Findings of Fact and Conclusions of Law as to the equitable action for an accounting.

## FINDINGS OF FACT

I. <u>The Parties</u>

    1. Plaintiffs Lise and Jeff King are married individuals who reside in the State of New York.

    2. Plaintiff Kittywalk Systems, Inc. ("Kittywalk") is a corporation maintaining its principle place of business in the State of New York.

    3. The Kings are principals of Kittywalk.

4. Kittywalk is engaged in the business of designing a variety of pet products, including, for example, pet strollers to be used for cats and other small animals.

5. Defendants Bradford D. White and Julie Anne White are married individuals who reside in the State of Massachusetts.

6. Defendant Midnight Pass Incorporated ("Midnight Pass") is a corporation maintaining its principle place of business in the State of Massachusetts.

7. Bradford White is the President as well as the sole officer and shareholder of Midnight Pass.

8. Midnight Pass is engaged in the business of direct marketing and distribution of a variety of consumer products.

II. The Parties' Business Relationship

9. At or around the summer of 2000, Lise King ("Mrs. King") invented an outdoor containment system for her pet cat. Mrs. King decided to attempt to sell this product and obtained a booth at an inventor's exposition in Waterbury, Connecticut (the "2000 Trade Show"). The product introduced by Mrs. King at the 2000 Trade Show was the first pet product that the Kings attempted to sell.

10. The Kings met Bradford D. White ("Mr. White") at the 2000 Trade Show when Mr. White approached the Kings and told Mrs. King that he could market their product. In a meeting at the exposition that lasted approximately twenty minutes, Mr. White told Mrs. King that if she could develop and manufacture pet products, he would market and sell those products.

11. The Kings and the Whites agreed to enter into a joint venture agreement (the

3

"Joint Venture") pursuant to which the Kings would develop and manufacture pet products and the Whites would market and distribute those products (the "Products"). The parties agreed that the Products would be sold under the "Kittywalk" name.

12. The terms of the Joint Venture were never reduced to writing. Thus, the parties acted, for several years, pursuant to unwritten terms.

13. The parties to the Joint Venture were the corporate entities that are parties to this lawsuit – Kittywalk and Midnight Pass.

14. While the Kings devoted al of their efforts to the development and manufacture of products sold under the Kittywalk name, the Whites were engaged in the business of marketing products of other entities, in addition to Kittywalk products.

15. Pursuant to the Joint Venture, the Kings arranged to have the Products designed by Mrs. King manufactured at a factory located in China. The Kings were responsible for all costs associated with the development, manufacture and importation of the Products.

16. After manufacture, the Products were shipped to a warehouse chosen and maintained by Mr. White. The Whites were responsible for all costs associated with the marketing, warehousing and post-importation shipping of the Products.

17. The terms of the Joint Venture provided that profits after sale of the Products were to be distributed evenly between the parties to the Joint Venture.

18. In a letter dated October 12, 2005, Kittywalk informed Midnight Pass that it would be terminating the Joint Venture as of November 30, 2005.

19. The Joint Venture terminated as of November 30, 2005.

III. The Finances of the Joint Venture

20. Midnight Pass introduced at trial detailed financial records of all income and expenses associated with the Joint Venture from its inception until its termination.

21. Although Kittywalk's post-trial submission refers to a "deliberate manipulation" of the books of the Joint Venture by Midnight Pass, the court finds no evidence to support this allegation and finds the books of the Joint Venture, submitted by Midnight Pass, to be an accurate account of the finances of the Joint Venture.

22. The financial records of the Joint Venture detailed the expenses for which Midnight Pass was responsible under the parties' agreement as to the marketing, warehousing and shipment of the Products. While the records included the expenses incurred by Midnight Pass in connection with all other business ventures, the records delineate clearly the expenses associated with the Joint Venture.

23. Among the Joint Venture selling expenses detailed in the Midnight Pass records were expenses attributable to advertising, call center, catalog production, credit card expenses and expenses relating to payments made to two individuals – Dana Roberts (in the amount of $152,588) and Dominic White (in the amount of $15,750).

24. The only Joint Venture selling expenses that Kittywalk took issue with at trial were the payments made to Dana Roberts and Dominic White. The court has reviewed the documents and testimony relating to this issue and finds that

Kittywalk acquiesced to charging the expenses attributable to Dana Roberts and Dominic White as Joint Venture selling expenses.

25. The court further finds such expenses to be properly attributable to the Joint Venture.

26. In addition to detailing the expenses incurred by Midnight Pass, the financial records introduced at trial detailed the expenses incurred by Kittywalk in connection with the manufacture and importation of Products sold pursuant to the Joint Venture. These expenses were reflected as payments due from Midnight Pass to Kittywalk from the sales of the Products.

27. The amount of money that the Joint Venture owed to Kittywalk for manufacture and importation of Products was reflected by the issuance of purchase orders to Kittywalk that covered the cost to Kittywalk.

28. Identified at trial was a company known as "Fully Wind." Fully Wind was a company engaged by Kittywalk to manufacture Products. At trial it was established that Kittywalk refused to pay $74,646.00 to Fully Wind when Kittywalk became aware that Fully Wind was engaged in the unauthorized sale of Kittywalk products. It is undisputed that Kittywalk never paid Fully Wind the amount at issue.

29. The financial records introduced at trial reflected the actual costs of inventory to the Joint Venture. After booking the amount owed to Fully Wind (by issuance of a purchase order to Kittywalk) as an inventory expense of the Joint Venture, Midnight Pass deducted from the expenses of the Joint Venture the amount that

Kittywalk refused to pay to Fully Wind. This is because it became clear that the amount at issue was money that Kittywalk was absolved of paying to Fully Wind for inventory and related expense. Because profits were calculated from actual costs of the inventory, and the amount not paid to Fully Wind was not an actual cost of inventory, Midnight Pass properly concluded that the Fully Wind expense was not an expense of the Joint Venture for the purpose of determining profit.

IV. Calculation of Joint Venture Profit

30. The net sales revenue of the Joint Venture, from its inception through its termination was $5,189,428.

31. The total cost of goods of the Joint Venture, from its inception through its termination was $2,788,730.

32. The total selling expenses of the Joint Venture, from its inception through its termination was $1,322,997.

33. The cost attributable to bad debts and return of products, with respect to sales of the Joint Venture prior to December 2005 was $2,889.

34. The adjusted gross profit of the Joint Venture, from its inception through its termination was $1,065,954.

35. Each party to the Joint Venture was entitled to 50% of the profits. Accordingly, Kittywalk and Midnight Pass were each entitled to receive $532,977 as profit.

36. From the inception of the Joint Venture through its termination, Kittywalk incurred manufacturing and expenses related thereto of $3,069,091.11.

37. From the inception of the Joint Venture through its termination, Midnight Pass

made payments to Kittywalk totaling $3,237,172.73. These payments represented reimbursement to Kittywalk for manufacturing expenses of $3,069,091.11 as well as $168,081,62 – a portion of the profit owed to Kittywalk. Because the total due to Kittywalk as profits of the Joint Venture, as detailed above, is $532,977, Kittywalk remains owed $364,895.38.

38. The amount of $364,895.38 owed to Kittywalk includes profit due from the Joint Venture as well as reimbursement for the 50% of the cost of a trade show booth used by the Joint Venture, retained by Midnight Pass, and originally purchased by Kittywalk.

## CONCLUSIONS OF LAW

I. Accounting Principles

39. This case is governed by the laws of the State of New York.

40. Under New York law, joint ventures are governed by the rules governing partnership. Scholastic v. Harris, 259 F.3d 73, 84 (2d Cir. 2001).

41. Dissolution of a partnership or joint venture occurs when a joint venturer ceases to be involved in the venture. Such dissolution requires the court to determine the parties' obligations and the distribution of assets with respect to winding up the affairs of the business. Scholastic, 259 F.3d at 84-85; N.Y. Partnership L. 60-61.

42. Once a joint venture is dissolved it ceases carry on business and its affairs are limited to closing up the joint venture affairs, disposing of assets and paying of creditors. Id. at 85.

43. The Joint Venture was dissolved on October 12, 2005, when Midnight Pass

received Kittywalk's letter terminating the Joint Venture as of November 30, 2005. The wind up period of the Joint Venture is therefore the period between October 12, 2005 and November 30, 2005.

44. After November 30, 2005, the parties were free to compete in the marketplace. Indeed, the evidence introduced at trial indicates that the parties went their separate ways, with Kittywalk distributing products with a new distributor and Midnight Pass disposing of product in its warehouse. With respect to the latter, Midnight Pass was responsible to account to Kittywalk for payments due under the Joint Venture agreement as described above. The amounts referred to above reflect such accounting.

## II. Personal Liability of the Whites

45. As noted, the parties to the Joint Venture were the corporate entities, Kittywalk and Midnight Pass. These corporate entities are distinct from the individuals through which they operate.

46. Kittywalk seeks to pierce the corporate veil to hold the Whites personally liable for the debts of Midnight Pass.

47. Under New York law, a court may pierce the corporate veil to hold owners of the corporation liable for its debts.

48. To pierce the corporate veil the plaintiff must prove that: (1) the owner exercised complete dominion over the corporation with respect to the transaction at issue and, (2) that such dominion was used to perpetrate a fraud or other wrong resulting in injury to the plaintiff. In re Vebeliunas, 332 F.3d 85, 91-92 (2d

Cir.2003); Morris v. New York State Dep't. of Taxation and Finance, 603 N.Y.S.2d 807, 810 (1993).

49. Whether the corporate veil should be pierced requires a fact specific inquiry. See MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC, 268 F.3d 58, 64 (2d Cir.2001); Morris, 603 N.Y.S.2d at 810.

50. New York courts consider the following factors in deciding whether the corporate veil should be pierced: (1) the absence of adherence to corporate formalities, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own. MAG Portfolio, 268 F.3d at 63.

51. There is no basis in this matter for piercing of the corporate veil. There was not evidence supporting any of the ten factors referred to above. Additionally, the court finds no support for Kittywalk's allegations of fraud and wrongdoing on behalf of Midnight Pass that would support veil piercing.

52. The Whites are not personally liable for the debts of Midnight Pass.

III.     Prejudgment Interest

     53.     This is an equitable action for an accounting under New York law.

     54.     Section 5001 of New York's Civil Practice Law and Rules provides that in such an action the court has discretion to determine whether to award pre-judgment interest. NY CPLR 5001. Midnight Pass has never questioned that it owed the amount referred to above to Kittywalk. It was argued only that Kittywalk owed in excess of this amount to Midnight pass on its Lanham Act claim.

     55.     Upon consideration, the court holds that interest on the amount awarded shall run from December 1, 2005.

     56.     Interest shall be calculated, pursuant to New York State law, at the rate of 9% per annum. See CPLR 5004.

## CONCLUSION

Judgment shall be entered in favor of Kittywalk and against Midnight Pass in the amount of $364,895.38. Interest on the judgment shall be calculated at the rate of 9% per annum and shall run from December 1, 2005. The Clerk of the Court is directed to terminate all outstanding motions and to close the file in this case.

SO ORDERED.

                                                                         LEONARD D. WEXLER
                                                                         UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
         January //, 2008